UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------

ANTHONY D. BRUCE,

                              Plaintiff,          **MEMORANDUM & ORDER**
                                                  15-CV-5361 (MKB)

          v.

CAROLYN W. COLVIN
*Acting Commissioner, Social Security*
*Administration*,

                              Defendant.

------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

        Plaintiff Anthony D. Bruce filed the above-captioned action pursuant to 42 U.S.C.

§ 405(g) seeking review of a final decision of the Commissioner of Social Security (the

"Commissioner") denying his claim for supplemental security income under the Social Security

Act (the "SSA").  Plaintiff moves for judgment on the pleadings pursuant to Rule 12(c) of the

Federal Rules of Civil Procedure, claiming that Administrative Law Judge Alan Berkowitz (the

"ALJ") erred in (1) failing to properly weigh the medical opinion evidence and (2) failing to

properly evaluate Plaintiff's credibility.  (Pl. Mot. for J. on the Pleadings,[1] Docket Entry No. 9;

Pl. Mem. in Supp. of Pl. Mot. ("Pl. Mem.") 7, 11, Docket Entry No. 10.)  The Commissioner

cross-moves for judgment on the pleadings, arguing that the ALJ's decision is supported by

substantial evidence and should be affirmed.  (Comm'r Cross-Mot. for J. on the Pleadings,

Docket Entry No. 13; Comm'r Mem. in Supp. of Def. Cross-Mot. ("Comm'r Mem."), Docket

---

[1]  Plaintiff's motion was improperly docketed to the electronic case filing ("ECF")
system as a "Motion for Summary Judgment," Docket Entry No. 9.  Because Plaintiff elsewhere
refers to the motion as one for Judgment on the Pleadings pursuant to Rule 12(c), the Court also
does so.

Entry No. 14.)  For the reasons set forth below, Plaintiff's motion for judgment on the pleadings is granted and the Commissioner's cross-motion for judgment on the pleadings is denied.

## I.  Background

Plaintiff was born in 1975.  (Certified Admin. Record ("R.") 174, Docket Entry No. 8.) Plaintiff has an eleventh-grade education.  (R. 29.)  He was previously self-employed as a painter, mover and cleaner.  (R. 30.)  On May 15, 2012, Plaintiff applied for supplemental security income, alleging he was disabled as of December 31, 1997 due to metal rods in his legs, headaches, and pain in his back, neck, shoulders, arms and legs.  (R. 60, 207.)  Plaintiff's application was denied after initial review, and he subsequently requested a hearing before the ALJ.  (R. 79–87.)  Plaintiff appeared with his attorney before the ALJ on March 17, 2014. (R. 24–44.)  By decision dated April 15, 2014, the ALJ determined that Plaintiff was not disabled and denied Plaintiff's application.  (R. 61–74.)  On July 22, 2015, the Appeals Council denied review of the ALJ's decision.  (R. 1–5.)

### a.  Plaintiff's testimony

At the March 17, 2014 administrative hearing, Plaintiff testified that he lived in Brooklyn with a friend.  (R. 28.)  He had arrived at the hearing by bus and train, which took him approximately one hour.  (R. 29.)  Plaintiff completed schooling through the eleventh grade. (R. 29.)  Prior to the onset of his disability in 1997, he had worked simultaneously as a painter, mover and cleaner.  (R. 30.)  In 1997, at the age of twenty-two, Plaintiff was hit by a car while he was crossing the street as a pedestrian.  (R. 31.)  As a result, he had undergone what he described as a "scalp surgery."  (R. 31.)  He also had herniated discs in his back and metal rods and screws in both legs.  (R. 38.)  Plaintiff explained that since the accident, he had not been able to maintain employment, although he had tried "a couple of times after."  (R. 31.)  The ALJ asked

Plaintiff if he believed he could maintain a job where he could "get up and stand at will," and Plaintiff said he could not. (R. 32.) He described his inability to stand or sit for long periods of time because of pain in his back and legs, and further described constant migraines. (R. 31.) Plaintiff had been administered one "pain shot" in his lower back, and would be receiving two more. (R. 35.) He had not undergone any back surgeries, and he sometimes wore a back brace and walked with a cane. (R. 36.) At the time of the hearing, Plaintiff attended physical therapy two to three times per week. (R. 37.) At the time of the administrative hearing, Plaintiff had been prescribed two pain medications: Voltaren and Flexeril. (R. 37.) Plaintiff testified that he could walk for varying lengths of time, depending on the day, and that he could not sit for "too long." (R. 39.) He could not lift anything, but had no problem with fine manipulation except to the extent that it involved his back. (R. 39, 41.) He described pain that shot through both of his legs. (R. 40.) Plaintiff did not do housework or shop. (R. 41.)

### b. Medical evidence

#### i. Brookdale Hospital Medical Center

Plaintiff was struck by a car on October 5, 1997,and was brought by ambulance to the emergency room of Brookdale Hospital Medical Center ("Brookdale"). (R. 238–39.) Plaintiff sustained bilateral tibia-fibula fractures with exposed bone, blood or air in his chest cavity and an "extensive lacerated wound to the scalp." (R. 239, 251, 315.) On October 6, 1997, Plaintiff underwent emergency orthopedic surgery to repair fractures of both legs, insert intramedullary rods and screws in his legs, and to drain and irrigate his chest and other wounds. (R. 245.) Plaintiff's right shoulder was also dislocated, and he felt pain in his neck and back. (R. 317.) Plaintiff's tibial wounds were irrigated again two days later, on October 8. (R. 245–46.)

Plaintiff obtained x-rays of his legs on December 12, 1997. (R. 345.) The x-rays

revealed new bone formation at the site of his tibial fracture and good placement of the intramedullary rods in both the left and right tibia. (R. 345.)

On December 5, 2011, Plaintiff presented to Brookdale with acute back pain that he described as mild and achy. (R. 341.) He also described chronic leg pain since his accident. (R. 341.) A physician at Brookdale diagnosed Plaintiff with chronic back and leg pain, prescribed him 650 milligrams of Tylenol and recommended that he follow up with an orthopedic specialist. (R. 342.)

### ii. Island Musculoskeletal Center

In December of 2012, Plaintiff began receiving treatment at Island Musculoskeletal Care. (R. 443.) His providers included orthopedic surgeons Paul Kubiak, M.D., Brett Silverman, D.O., and Robert Hecht, M.D., as well as various physical therapists. (R. 443.)

#### 1. Dr. Paul Kubiak

On December 13, 2012, Plaintiff visited Paul Kubiak, M.D., an orthopedic surgeon, for pain in his back and both legs. (R. 389–90.) Plaintiff explained that because he lacked insurance until recently, he had not undergone follow-up treatments and care since his accident in 1997. (R. 389.) Dr. Kubiak noted that Plaintiff was not taking medication at the time and that he ambulated with the assistance of a cane. (R. 389.) Dr. Kubiak examined Plaintiff and noted "midline bony tenderness to palpitation" in Plaintiff's back, with limited motion on flexion and extension. (R. 389.) Plaintiff extended his knees fully, but experienced mild and generalized weakness in both legs. (R. 389.) X-rays of Plaintiff's lumbar spine reflected moderate degenerative changes in the spine with some hypertrophic bone spurs. (R. 390.) Dr. Kubiak diagnosed Plaintiff with low back and bilateral leg pain and noted that, "given the long[-]standing nature of his pains . . . there is a very good chance that is he going to have

chronic pain for the rest of his life in relation to these injuries." (R. 390.) Dr. Kubiak recommended that Plaintiff see a pain management specialist about long-term treatments, and that he undergo physical therapy and take Voltaren to control his pain. (R. 390.) He also recommended that Plaintiff undergo an MRI. (R. 390.)

On January 24, 2013, Plaintiff received an MRI of his lumbar spine that revealed diffuse multilevel bulging and facet arthropathy, with degenerative disc disease at L5-S1. (R. 427.) Plaintiff had a broad bulge at his L4-L5 discs, resulting in encroachment and contact with the L4 nerve root. (R. 427.) Plaintiff also had a broad bulge at his L5-S1 discs, which resulted in foraminal encroachment and contact with the L5 nerve root. (R. 427.) The MRI of Plaintiff's right knee showed post-operative tibia changes and a small popliteal cyst. (R. 423–24.) The MRI of Plaintiff's left knee revealed a horizontal tear of the lateral meniscus, intramuscular edema, and findings consistent with the presence of surgical hardware. (R. 425–26.)

On May 28, 2013, Plaintiff returned to Dr. Kubiak and reported that he had tried to see a pain management physician but that the physician was far away from his home. (R. 386.) Plaintiff's back showed midline bony tenderness to palpation with limited motion on flexion and extension through his lumbar spine. (R. 386.) He also exhibited tenderness to palpation along the length of his tibia. (R. 386.) Dr. Kubiak's impression was that Plaintiff had bilateral leg pain and low back pain, and he recommended that Plaintiff see a pain management doctor because physical therapy had not been helpful. (R. 386.)

On August 29, 2013, Plaintiff visited Dr. Kubiak for a follow-up appointment. (R. 385.) Plaintiff reported that he had been seeing a pain management specialist, but that he continued to have trouble with "heavier" standing, walking and physical activity. (R. 385.) Dr. Kubiak noted that Plaintiff was able to flex and extend his knees and to ambulate without an assistive device.

(R. 385.)  Plaintiff exhibited limited motion on flexion and extension through his lumbar spine.

(R. 385.)  Dr. Kubiak noted that his plan was to have Plaintiff continue physical therapy and to

see what pain management options might exist for Plaintiff.  (R. 385.)

On October 10, 2013, Plaintiff returned to see Dr. Kubiak.  (R. 375.)  Plaintiff told Dr.

Kubiak that he had a pain management specialist but had not yet attended a treatment.  (R. 375.)

Dr. Kubiak's impressions were substantially similar to those of August 29, 2013, and he noted

that he would like Plaintiff to continue physical therapy.  (R. 375.)

### 2.  Dr. Brett Silverman

On March 25, 2013, Plaintiff saw Brett Silverman, M.D., a rehabilitation specialist, for an

evaluation of his pain and to begin an ongoing course of treatment.  (R. 388.)  Dr. Silverman

noted that Plaintiff ambulated with a "fairly normal gait" and without any assisted devices.  (R.

388.)  He had tenderness to palpitation in his lumbar muscles, and restrictions with forward

flexion and extension.  (R. 388.)  Plaintiff demonstrated mild weakness in his lower extremities,

but with good strength and no motor weakness.  (R. 388.)  Dr. Silverman advised Plaintiff to

continue with therapy.  (R. 388.)

Plaintiff attended nineteen sessions of physical therapy between April 24 and November

18, 2013.  (R. 376–82, 391–422.)  He was diagnosed with lumbago, pain in the joints that

involved his lower leg, pain in the joints that involved his ankle and foot, and pain in his limbs.

(R. 376.)  Plaintiff reported persistent pain that ebbed and flowed throughout his day for months

at a time.  (R. 376–82.)  His knee joints occasionally swelled, and he had difficulty moving from

sitting to standing positions.  (R. 376–82.)  The physical therapy treatment notes indicate that

Plaintiff tolerated treatment well, but that he was still limited with daily functional activities over

the course of his therapy.  (R. 382, 392, 394.)  At various times, Plaintiff was observed to show a

"fair sitting/standing tolerance," (R. 395, 401), difficulty with prolonged walking and standing (R. 403), and increases and decreases in his range of motion, (R. 397, 399, 403).

Plaintiff returned to Dr. Silverman on May 13, 2013. (R. 387.) Plaintiff walked with a normal gait, without any assistive devices, and transferred on and off the examining table by himself. (R. 387.) His lower spine was tender to palpation, and his forward flexion and extension were limited. (R. 387.) His seated leg raise was negative. (R. 387.) Dr. Silverman's impression was one of low back pain and degeneration, as well as bilateral leg pain. (R. 387.) Plaintiff was told to follow up with his orthopedist, Dr. Kubiak, and to obtain help with pain management. (R. 387.)

On November 18, 2013, Plaintiff saw Dr. Silverman for a "psychiatric re-evaluation." (R. 374.) Dr. Silverman noted Plaintiff's history of chronic back pain, degenerative disc disease and a meniscus tear in his left knee, as well as the surgical history from Plaintiff's tibial fractures. (R. 374.) He noted that Plaintiff was seeing a doctor for pain management, and that Plaintiff intended to receive a lumbar epidural injection. (R. 374.) Dr. Silverman noted that Plaintiff ambulated with a normal gait and no assistive devices. (R. 374.) Plaintiff had tenderness to palpation of his lumbar spine, and his forward flexion was thirty degrees, while his extension was ten degrees. (R. 374.) Plaintiff's seated straight-leg raise testing was negative. (R. 374.) Dr. Silverman's impressions were "low back pain and degeneration," and "bilateral leg ORIF for fractures." (R. 374.) He recommended that Plaintiff continue with therapy and follow up with Dr. Vikas Varma, Plaintiff's pain management specialist, for injections and pain management. (R. 374.)

### 3.  Dr. Robert Hecht

On September 4, 2013, Robert Hecht, M.D., a rehabilitation specialist, examined Plaintiff

and wrote a letter on Plaintiff's behalf directed "to whom it may concern." (R. 383–85.) Dr. Hecht reported that Plaintiff had been visiting Island Musculoskeletal Center since December 13, 2012, for pain in his back, knees and legs. (R. 383.) Dr. Hecht noted that despite Plaintiff's treatment with physical therapy and Voltaren, his pain persisted. (R. 383.) Dr. Hecht wrote that the January 24, 2013 MRI of Plaintiff's lumbar spine revealed diffuse multilevel bulging and facet arthropathy with degenerative disc disease, most notably at L5-S1. (R. 383.) Broad bulges in Plaintiff's L4-L5 and L5-S1 discs resulted in contact with bilateral exiting nerve roots. (R. 383.) An MRI of Plaintiff's left knee on January 28, 2013, revealed a horizontal tear of the lateral meniscus and an intramuscular edema. (R. 383.) An MRI of Plaintiff's left knee on January 25, 2013, revealed post-operative changes of his tibia and a small popliteal cyst, but no meniscal tear. (R. 383.)

Dr. Hecht examined Plaintiff and found that he had tenderness in his lumbar spine. (R. 383.) Plaintiff had flexion to fifty degrees, where normal was ninety degrees; extension to ten degrees, where normal was thirty degrees; left lateral flexion to zero degrees, where normal was twenty degrees; right lateral flexion to ten degrees, where normal was twenty degrees; and right lateral rotation to ten degrees, where normal was thirty degrees. (R. 383.) Plaintiff's straight leg test was negative bilaterally. (R. 383.) Dr. Hecht noted multiple scars on Plaintiff's knees, consistent with his prior surgery. (R. 383.) Dr. Hecht examined Plaintiff's knee mobility, observing that Plaintiff's left knee lacked extension by ten degrees, where normal was zero degrees; and his flexion was 100 degrees, where normal was 135 degrees. (R. 383.) Plaintiff's left knee tested positive for crepitus and positive in a McMurray's Test, denoting a meniscal tear. (R. 383.) Plaintiff's right knee lacked extension by five degrees, where normal was zero degrees; and his flexion was 110 degrees, where normal was 135 degrees. (R. 383.) Plaintiff's

right knee also tested positive for crepitus and positive in a McMurray's Test. (R. 383.)

Dr. Hecht noted that beyond these limitations, Plaintiff had "a full active range of motion of bilateral hips and ankles." (R. 384.) His motor strength was good, sensation was intact and reflexes were good. (R. 384.) Dr. Hecht's impressions were that Plaintiff suffered from a lumbar disc bulge, internal derangement of bilateral knees, degenerative joint disease of bilateral knees, status post-fracture of bilateral tibia-fibula and status post-open reduction internal fixation ("ORIF"). (R. 384.) He concluded that Plaintiff's complaints were consistent with examination findings and longitudinal testing, and they limited Plaintiff's ability to "lift, carry, sit, stand, walk, push, pull, bend and stoop." (R. 384.) Dr. Hecht opined that he expected Plaintiff's disability to persist. (R. 384.)

Dr. Hecht also completed a regional pain impairment questionnaire on September 4, 2013. (R. 435.) In that questionnaire, he indicated that Plaintiff had received his first treatment on December 13, 2012, and his most recent examination on September 4, 2013. (R. 435.) Dr. Hecht wrote that Plaintiff's prognosis was "poor" and characterized Plaintiff's pain as a nine on a scale of one to ten. (R. 437.) In response to questions asking him to "estimate [Plaintiff's] functional limitations" in a normal five-day work week, Dr. Hecht indicated that Plaintiff could sit for approximately three hours per day and stand or walk for approximately two hours per day. (R. 437.) He checked "yes" to two questions that asked whether it would be "necessary or medically recommended" for Plaintiff "not to sit continuously in a work setting" and "not to stand/walk continuously in a work setting." (R. 437.) Dr. Hecht noted that Plaintiff would have to stand up and move around every twenty-to-thirty minutes, and that he would stand or walk for five-to-ten minutes before sitting again. (R. 437.) Responding to form boxes reflecting the weight that Plaintiff could lift and carry, Dr. Hecht indicated that Plaintiff could "occasionally"

lift up to five pounds, but could "never" lift over five pounds.  (R. 438.)  He also indicated that Plaintiff could "occasionally" carry up to five pounds, but could "never" carry over five pounds.  (R. 438.)

Dr. Hecht answered affirmatively to the question of whether Plaintiff's impairments lasted or could be expected to last at least twelve months, and he indicated that Plaintiff's experience of pain, fatigue and other symptoms "frequently" interfered with his attention and concentration.  (R. 438–39.)  Dr. Hecht wrote that Plaintiff could tolerate low-stress jobs, but that during an eight-hour workday, Plaintiff would have to take five-to-ten unscheduled breaks to rest or relieve pain, with each break lasting approximately five-to-ten minutes.  (R. 439.)  He noted that Plaintiff did not require an assistive device for standing and walking, and that he had "significant limitations" in "repetitive reaching, handling, fingering or lifting."  (R. 439–440.)  Dr. Hecht wrote that Plaintiff would have "no limitations" in grasping, turning and twisting objections or using his fingers and hands for fine manipulations, but would have "marked" limitations such that he would be "essentially precluded" from using his arms for reaching, including overhead.  (R. 440.)  Dr. Hecht also advised that Plaintiff was limited in his ability to push, pull, kneel, bend and stoop.  (R. 441.)  He estimated that Plaintiff would miss work, on average, at least four times per month because of his impairments and treatments.  (R. 440.)

### iii.   Dr. Vikas Varma

At Dr. Kubiak's recommendation, Plaintiff saw Vikas Varma, M.D., a neurologist with a specialty in pain medicine, for a pain management examination on November 8, 2013.  (R. 367.)  Dr. Varma noted that Plaintiff complained of intermittent pain in both legs with back pain in the "thoracic and lumbar area, radiating to the back, hip, buttock and legs."  (R. 367.)  Upon examination, Plaintiff had a normal gait and good strength in all muscles, but limited range of

motion in his lumbar spine and bilateral knees. (R. 367.) Dr. Varma noted that an MRI of Plaintiff's lumbar spine showed "degenerative facet arthropathy and multilevel disc bulge." (R. 368.) Dr. Varma diagnosed Plaintiff with low back pain with lumbar disc bulges and multilevel facet arthropathy, bilateral lumbar radiculopathy, "intractable pain, which was not responding to extensive treatment," progressive weakness in lower extremities and MRI evidence of "multilevel degenerative disc disease . . . and early spinal stenosis." (R. 368.) Dr. Varma recommended that Plaintiff obtain a back brace, start taking a muscle relaxant and undergo three lumbar epidural injections. (R. 369.)

### iv. Dr. Louise Tranese

On July 19, 2012, Plaintiff reported to Louise Tranese, D.O., for a consultative orthopedic examination at the Commissioner's request. (R. 347.) Dr. Tranese noted that Plaintiff characterized his lower back pain as a "localized, dull, stiff ache, graded 6/10 to 8/10." (R. 347.) Plaintiff also complained of bilateral knee pain, which he characterized as a "severe, dull, burning, achy pain, graded 8/10." (R. 347.) In her examination notes, Dr. Tranese wrote that Plaintiff did not complain of numbness or tingling in his lower extremities, but that his back and knee pain was aggravated by kneeling, squatting, bending, heavy lifting, walking a long distance and standing for extended periods of time. (R. 347.) He was able to walk normally, without assistive devices, and could rise from a chair without difficulty. (R. 348.) He took over-the-counter pain medication, which, along with frequent shifts of position and movement, provided him mild and temporary pain relief. (R. 347.) Dr. Tranese reported full fine motor activity in Plaintiff's hands and full range of motion in Plaintiff's cervical spine and upper extremities. (R. 348.) Plaintiff had limited extension and rotary movement in his thoracic and lumbar spines because of pain and tenderness. (R. 348.) Dr. Tranese diagnosed Plaintiff with a

"history of pedestrian struck by automobile with reported history of back and knee injuries," a "history of bilateral tibia fractures/open reduction internal fixation," and "chronic lower back pain." (R. 349.) According to Dr. Tranese, Plaintiff's prognosis was "fair to good." (R. 349.) An x-ray of Plaintiff's lumbar spine and knees reflected no abnormalities except for his status post-surgery. (R. 351.) Dr. Tranese concluded that Plaintiff had "moderate restriction" with squatting, kneeling and crouching; "mild to moderate restriction" with frequent stair-climbing or walking long distances; "mild restriction" with standing long periods of time; and "mild to moderate restriction" with frequent bending and heavy lifting. (R. 349.)

### c. The ALJ's decision

The ALJ conducted the five-step sequential analysis as required by the Social Security Administration under the authority of the SSA.

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since May 15, 2012, the date of Plaintiff's application for benefits. (R. 66.) At step two, the ALJ found that Plaintiff had the following severe impairments: status post-leg fracture, ORIF and bulging discs. (R. 66.) At step three, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meets, or is equal to, the severity of one of the impairments listed in Appendix 1 of the Social Security Regulations.[2] (R. 66.)

At step four, the ALJ found that Plaintiff has the residual functional capacity ("RFC") to perform "the full range of sedentary work" as defined in Appendix 1. (R. 66–67.) After reviewing the medical evidence and Plaintiff's testimony, the ALJ concluded that "there is evidence that [Plaintiff's] alleged impairments limit his functioning, however, not to the degree

---

[2] The ALJ did not identify the listed impairments to which he compared Plaintiff's condition. Plaintiff does not challenge the ALJ's step-three determination.

that [he] alleges." (R. 69.) This was because, although Plaintiff "alleges disability due to migraines, metal rods in his legs, and pain in his back, neck, shoulder, arm and leg," Plaintiff was "able to perform some activities, travel independently by public transportation and his hands are functioning properly." (R. 69.) In assessing the opinion evidence, the ALJ assigned "great weight" to the opinion of Dr. Tranese, the consultative examiner, because it was "consistent with the medical evidence of record." (R. 69.) The ALJ assigned "little weight" to the opinion of Dr. Hecht because "there are no objective test [sic] or reasoning for limited number of hours other than statements from [Plaintiff]." (R. 69.)

Finally, the ALJ determined that Plaintiff was not capable of performing his past relevant work as a mover, painter and cleaner, but concluded that based on Plaintiff's age, education, work experience and RFC, "there are jobs that exist in significant numbers in the national economy" that Plaintiff can perform.[3] (R. 70.) Therefore, the ALJ determined that since May 15, 2012, Plaintiff had not been suffering from a "disability" as this term is defined under the SSA. (R. 70.)

## II. Discussion

### a. Standard of review

"In reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision." *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004), *as amended on reh'g in part*, 416 F.3d 101 (2d Cir. 2005); *see also Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam). "Substantial evidence is 'more than a mere scintilla' and 'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Lesterhuis v. Colvin*,

---

[3] The ALJ did not identify the jobs that Plaintiff could perform.

805 F.3d 83, 87 (2d Cir. 2015) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971));

*McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014) (same). Once an ALJ finds facts, the court

"can reject those facts only if a reasonable factfinder would *have to conclude otherwise.*" *Brault*

*v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012) (citations and internal quotation marks

omitted). In deciding whether substantial evidence exists, the court "defer[s] to the

Commissioner's resolution of conflicting evidence." *Cage v. Comm'r of Soc. Sec.*, 692 F.3d

118, 122 (2d Cir. 2012); *McIntyre*, 758 F.3d at 149 ("If evidence is susceptible to more than one

rational interpretation, the Commissioner's conclusion must be upheld."). The Commissioner's

factual findings "must be given conclusive effect so long as they are supported by substantial

evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citation and internal quotations

omitted). If, however, the Commissioner's decision is not supported by substantial evidence or

is based on legal error, a court may set aside the decision of the Commissioner. *Box v. Colvin*,

3 F. Supp. 3d 27, 41 (E.D.N.Y. 2014); *see Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998).

"In making such determinations, courts should be mindful that '[t]he Social Security Act is a

remedial statute which must be 'liberally applied'; its intent is inclusion rather than exclusion.'"

*McCall v. Astrue*, No. 05-CV-2042, 2008 WL 5378121, at *8 (S.D.N.Y. Dec. 23, 2008)

(alteration in original) (quoting *Rivera v. Schweiker*, 717 F.2d 719, 723 (2d Cir. 1983)).

### b. Availability of benefits

Supplemental security income ("SSI") is available to individuals who are "disabled"

within the meaning of the SSA.[4] Federal disability insurance benefits are also available to

individuals who are "disabled" within the meaning of the SSA. To be considered disabled under

---

[4] SSI is available to individuals who are sixty five years of age or older, blind or disabled and meet certain income requirements. 42 U.S.C. §§ 1382(a), 1382c(a)(1)(A); 20 C.F.R. § 416.202. The only issue before the Court is whether Plaintiff is disabled.

the SSA, a plaintiff must establish his or her inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The impairment must be of "such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* §§ 423(d)(2)(A), 1382c(a)(3)(B). The Commissioner has promulgated a five-step analysis for evaluating disability claims. 20 C.F.R. §§ 404.1520, 416.920. The Second Circuit has described the steps as follows:

> The first step of this process requires the [Commissioner] to determine whether the claimant is presently employed. If the claimant is not employed, the [Commissioner] then determines whether the claimant has a "severe impairment" that limits her capacity to work. If the claimant has such an impairment, the [Commissioner] next considers whether the claimant has an impairment that is listed in Appendix 1 of the regulations. When the claimant has such an impairment, the [Commissioner] will find the claimant disabled. However, if the claimant does not have a listed impairment, the [Commissioner] must determine, under the fourth step, whether the claimant possesses the residual functional capacity to perform her past relevant work. Finally, if the claimant is unable to perform her past relevant work, the [Commissioner] determines whether the claimant is capable of performing any other work. If the claimant satisfies her burden of proving the requirements in the first four steps, the burden then shifts to the [Commissioner] to prove in the fifth step that the claimant is capable of working.

*Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) (quoting *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)); *see also Lesterhuis*, 805 F.3d at 86 n.2 (describing the "five-step sequential evaluation for adjudication of disability claims, set forth at 20 C.F.R. § 404.1520"); *McIntyre*, 758 F.3d at 150 (describing "the five-step, sequential evaluation process used to determine whether a claimant is disabled" (citing 20 C.F.R. § 416.920(a)(4)(i)–(v))).

### c.    Analysis

Plaintiff moves for judgment on the pleadings, arguing that the ALJ erred in (1) failing to properly weigh the medical opinion evidence and (2) failing to properly evaluate Plaintiff's credibility.  (Pl. Mem. 7, 11.)  The Commissioner cross-moves for judgment on the pleadings, arguing that the ALJ (1) correctly weighted the opinion evidence and (2) correctly found that Plaintiff's description of his symptoms were "not entirely credible."  (Comm'r Mem. 15, 19.)

### i.    The ALJ improperly weighted the medical opinion evidence

Plaintiff argues that the ALJ discounted Dr. Hecht's opinion of Plaintiff's functional abilities, in violation of the treating-physician rule.  (Pl. Mem. 8.)  Plaintiff also argues that the ALJ instead improperly relied on the findings of Dr. Tranese, a one-time consultative examiner whose opinion was not entitled to significant weight.  (*Id.* at 9.)  The Commissioner argues that the ALJ properly accorded little weight to Dr. Hecht's opinion because it was "insufficiently supported by objective findings" and because it contradicted the findings and opinion of Dr. Tranese.  (Comm'r Mem. 16.)

### 1.    Treating-physician rule – Dr. Hecht

"[A] treating physician's statement that the claimant is disabled cannot itself be determinative."  *Micheli v. Astrue*, 501 F. App'x 26, 28 (2d Cir. 2012) (quoting *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)); *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) (same).  But a treating physician's opinion as to the "nature and severity" of a plaintiff's impairments will be given "controlling weight" if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other

substantial evidence in [the plaintiff's] case record."[5] 20 C.F.R. § 404.1527(c)(2); *see Lesterhuis*, 805 F.3d at 88 (discussing the treating physician rule); *Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011) ("The opinion of a treating physician is accorded extra weight because the continuity of treatment he provides and the doctor/patient relationship he develops place[s] him in a unique position to make a complete and accurate diagnosis of his patient." (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983) (per curiam))).

An ALJ must consider a number of factors to determine how much weight to assign to a treating physician's opinion, specifically: "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian*, 708 F.3d at 418 (citing *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008)); *see also Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (citing 20 C.F.R. § 404.1527(d)(2) and discussing the factors). The ALJ must set forth the reasons for the weight assigned to the treating physician's opinion. *Halloran*, 362 F.3d at 32. While the ALJ is not required to explicitly discuss the factors, it must be clear from the decision that the proper analysis was undertaken. *See Petrie*, 412 F. App'x at 406 ("[W]here 'the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability.'" (quoting *Mongeur*, 722 F.2d at 1040)). Failure "to provide good reasons for not crediting the opinion of a claimant's

---

[5] A treating source is defined as a plaintiff's "own physician, psychologist, or other acceptable medical source" who has provided plaintiff "with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the plaintiff]." 20 C.F.R. § 404.1502; *see also Bailey v. Astrue*, 815 F. Supp. 2d 590, 597 (E.D.N.Y. 2011).

treating physician is a ground for remand." *Sanders v. Comm'r of Soc. Sec.*, 506 F. App'x 74, 77 (2d Cir. 2012); *see also Halloran*, 362 F.3d at 32–33 ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physicians['] opinion . . . .").

Here, the ALJ did not adequately explain his reasons for according "little weight" to Dr. Hecht's medical opinion of Plaintiff's functional abilities. (R. 69.) The ALJ considered Dr. Hecht's findings with a single sentence: "Little weight is given to the opinion of Dr. Hecht[,] who opined that [Plaintiff] could sit for three hours, which there are no objective test or reasoning for [sic] limited number of hours other than statements from [Plaintiff]." (R. 69.) This is insufficient to meet the dictates of the treating-physician rule. If Dr. Hecht's opinion was supported by acceptable laboratory and clinical diagnostic techniques, as evidenced in the treatment records he reviewed from Dr. Silverman and Dr. Kubiak, then Dr. Hecht's opinion is entitled to controlling weight if it does not conflict with the other substantial evidence in Plaintiff's record. *See Lesterhuis*, 805 F.3d at 88.

Dr. Hecht stated that his opinions were based on clinical and diagnostic abnormalities, including MRIs of Plaintiff's back and knees; tenderness in his lumbar spine; limited motion in his lumbar flexion, extension, lateral flexion, and rotation; diffuse tenderness and decreased motion in both knees; and swelling, crepitus and positive McMurray's Tests in both knees. (R. 383.) The ALJ does not appear to have considered this information, and instead concluded that Dr. Hecht's opinion is based purely on Plaintiff's subjective statements — a conclusion for which there is no evidence in the record. (*See* R. 69, 383–85.) Absent some indication that Dr. Hecht's opinion of Plaintiff's functional limitation is anything but "well-supported by medically acceptable clinical and laboratory diagnostic techniques," it should be given "controlling weight"

provided it is "not inconsistent with the other substantial evidence in [Plaintiff's] record." *See* 20 C.F.R. § 404.1527(c)(2). Because the ALJ neither afforded Dr. Hecht's opinions controlling weight nor adequately supported his decision to accord them little weight, the ALJ erred in his treatment of Dr. Hecht's medical opinion evidence.

### 2. Consultative examiner – Dr. Tranese

Under the SSA, a "nontreating source" is defined as a "physician, psychologist, or other acceptable medical source who has examined [the plaintiff] but does not have, or did not have, an ongoing treatment relationship with [the plaintiff]." 20 C.F.R. § 416.902. In general, "ALJs should not rely heavily on the findings of consultative physicians after a single examination." *Selian*, 708 F.3d at 419. This is because "consultative exams are often brief, are generally performed without the benefit or review of claimant's medical history and, at best, only give a glimpse of the claimant on a single day." *Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990); *Hernandez v. Astrue*, 814 F. Supp. 2d 168, 182–83 (E.D.N.Y. 2011) ("[T]he opinion of a consultative physician, 'who only examined a plaintiff once, should not be accorded the same weight as the opinion of [a] plaintiff's treating psychotherapist.'" (quoting *Cruz*, 912 F.2d at 13)). Nevertheless, the opinions of consultative examining medical sources can constitute substantial evidence in support of the ALJ's decision if they are supported by evidence in the record. *See Petrie*, 412 F. App'x at 405 ("The report of a consultative physician may constitute [] substantial evidence [by which to compare the treating physician's opinion]."); *Mongeur v. Heckler*, 722 F.2d 1033, 1039 (2d Cir. 1983) ("It is an accepted principle that the opinion of a treating physician is not binding if it is contradicted by substantial evidence, and the report of a consultative physician may constitute such evidence." (citations omitted)).

Here, the ALJ credited Dr. Tranese's findings over those of Dr. Hecht, even though Dr.

Tranese performed only one consultative examination and, as Plaintiff notes, may not have been provided with Plaintiff's medical records or diagnostic imaging. (*See* R. 69; Pl. Mem. 9.) In addition, the ALJ made no effort to reconcile Dr. Tranese's findings with those of Dr. Hecht, Dr. Silverman or Dr. Kubiak, instead concluding that "[a]s for the opinion evidence, Dr. Tranese's evidence is given great weight." (R. 69.) The failure to provide "good reasons" for not crediting Dr. Hecht's medical opinion and substituting it for that of Dr. Tranese by itself warrants remand. *See Selian*, 708 F.3d at 419 (citing *Snell*, 177 F.3d at 133)).

### ii.     The ALJ improperly evaluated Plaintiff's credibility

Plaintiff argues that the ALJ failed to properly evaluate his credibility, instead arriving at the unfounded conclusion that Plaintiff was "not entirely credible." (Pl. Mem. 12.) The Commissioner argues that the ALJ "appropriately considered Plaintiff's daily activities" in finding that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [his] symptoms" were not consistent with the medical record. (Comm'r Mem. 20.)

While SSA regulations require an ALJ "to take the claimant's reports of pain and other limitations into account, he or she is not required to accept the claimant's subjective complaints without question." *Campbell v. Astrue*, 465 F. App'x 4, 7 (2d Cir. 2012) (alteration omitted) (quoting *Genier*, 606 F.3d at 49). Rather, the ALJ evaluates the claimants' contentions of pain through a two-step inquiry. First, "the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged," including pain. *Genier*, 606 F.3d at 49 (2d Cir. 2010) (citing 20 C.F.R. § 404.1529(b)). "If so, the ALJ must then consider 'the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence of record.'" *Campbell*, 465 F. App'x at 7 (alteration in original) (quoting *Genier*, 606 F.3d at 49).

At the second stage, the ALJ must first consider all of the available medical evidence, including a claimant's statements, treating physician's reports, and other medical professional reports. *Whipple v. Astrue*, 479 F. App'x 367, 370–71 (2d Cir. 2012). To the extent that a claimant's allegations of pain "are not substantiated by the objective medical evidence, the ALJ must engage in a credibility inquiry." *Meadors*, 370 F. App'x at 184 (citing § 404.1529(c)(3)(i)–(vii)). In conducting the credibility inquiry, the ALJ must consider seven factors.[6]

Although the ALJ appears to have considered some of the factors necessary to evaluate Plaintiff's credibility — for example, Plaintiff's medication and the nature of his daily activities — he did not consider many others, and, more significantly, did not explain the bearing of these factors on the evidence in the medical record and on Plaintiff's reported symptoms. Instead, the ALJ noted that because Plaintiff was "able to perform some activities, travel independently by public transportation and his hands are functioning properly," his alleged impairments do not limit his functioning to the degree he states. (R. 69.) The ALJ's failure to consider all of the factors in making a credibility determination is cause for remand. *See Murdaugh v. Sec. of Dep't of Health & Hum. Servs.*, 837 F.2d 99, 102 (2d Cir. 1988) (noting that the fact that the plaintiff "waters his landlady's garden, occasionally visits friends and is able to get on and off an examination table can scarcely be said to controvert the medical evidence" of disability); *see also*

---

[6] The factors are:

> (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medications taken to alleviate the pain; (5) any treatment, other than medication, that the claimant has received; (6) any other measures that the claimant employs to relieve the pain; and (7) other factors concerning the claimant's functional limitations and restrictions as a result of the pain.

20 C.F.R. § 404.1529(c)(3)(i)–(vii); *Meadors v. Astrue*, 370 F. App'x 179, 183 n.1 (2d Cir. 2010) (quoting 20 C.F.R. § 404.1529(c)(3)(i)–(vii)).

*Verdaguer v. Colvin*, No. 12-CV-6858, 2013 WL 6426931, at *10 (S.D.N.Y. Dec. 9, 2013) ("[T]he ALJ erred when he provided no analysis of the 'type, dosage, effectiveness, and side effects of any medication' Plaintiff 'take[s] or ha[s] taken to alleviate [his] pain or other symptoms,' as he was required to do." (quoting 20 C.F.R. § 404.1529(c)(3)(iv))); *Kane v. Astrue*, 942 F. Supp. 2d 301, 314 (E.D.N.Y. 2013) (finding that the ALJ erred in the credibility determination of a claimant's contention of pain where the ALJ failed to "identify what facts he found to be significant, or indicate how he balanced the various factors," and did not "address how Plaintiff's continuous treatment for pain over a more than two-year period, including numerous medications . . . affects Plaintiff's credibility" (quoting *Simone v. Astrue,* No. 08-CV-4884, 2009 WL 2992305, at *11 (E.D.N.Y. Sept. 16, 2009))); *Correale-Englehart v. Astrue*, 687 F. Supp. 2d 396, 437 (S.D.N.Y. 2010) (finding that the ALJ erred in discounting plaintiff's reports of taking pain medication and noting that "[t]he fact that plaintiff was taking such pain medication over a two-year period is, if anything, another indication that she was experiencing serious pain since the motor vehicle accident," and that "the ALJ failed to mention other medications . . . and how they affected her overall functioning, again failing to take into account all pertinent evidence"). The Court remands for reconsideration of all of the factors required by § 404.1529(c)(3). *See Meadors*, 370 F. App'x at 185 ("[O]n remand, the ALJ should be mindful to consider each of the factors set forth in § 404.1529(c)(3).").

Because the Court remands the case for further consideration of the medical opinion evidence and of Plaintiff's credibility, the Court will not address Plaintiff's remaining arguments, as the ALJ's error in step four impacts the Court's ability to review the ALJ's determination in step five.

### III. Conclusion

For the foregoing reasons, Plaintiff's motion for judgment on the pleadings is granted and the Commissioner's cross-motion for judgment on the pleadings is denied. The Commissioner's decision is vacated, and this action is remanded for further administrative proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g). The Clerk of Court is directed to close this case.

SO ORDERED:

_____s/ MKB_____
MARGO K. BRODIE
United States District Judge

Dated: December 1, 2016
      Brooklyn, New York